930 So.2d 1233 (2006)
RCC PROPERTIES, L.L.C., Plaintiff-Appellee,
v.
WENSTAR PROPERTIES, L.P., Defendant-Appellant.
No. 40,996-CA.
Court of Appeal of Louisiana, Second Circuit.
June 5, 2006.
*1234 Snellings, Breard, Sartor, Inabnett & Trascher, L.L.P. by Clara Moss Sartor Wendy E.W. Giovingo, for Appellant.
Hudson, Potts & Bernstein, L.L.P. by William Craig Henry, Counsel for Appellee.
Before PEATROSS, DREW and MOORE, JJ.
DREW, J.
Wenstar Properties, L.P., appeals from a judgment invalidating a predial servitude in favor of an estate owned by Wenstar. We reverse and render.

FACTS
In 2002, AZT Winnsboro La., Inc., (AZT) sold a tract[1] to Wenstar. A Wendy's restaurant is currently operating on the Wenstar property (the dominant estate). In the "Act of Cash Sale and Servitude," AZT, the vendor, granted to Wenstar, the vendee, a servitude in the following language:
Vendor also grants to vendee a predial servitude in favor of the Property prohibiting the use of the property adjacent to the Property that is owned by Vendor and described on Exhibit A attached hereto and made a part hereof (hereinafter, Vendor's Adjacent Property) or any part or parcel thereof for a restaurant with a drive-thru pick-up window, the primary business of which is the sale of hamburgers, hamburger products or chicken sandwiches (or any combination thereof). For the purposes of this servitude and restriction, a restaurant has the aforesaid products as its primary business if fifteen percent (15%) or more of its gross sales, exclusive of taxes, beverage and dairy product sales, consists of sales of hamburgers, hamburger products or chicken sandwiches (or any combination thereof). This servitude and restriction shall burden Vendor's Adjacent Property for a period of twenty (20) years from the date of this act of sale; provided, however, that this servitude *1235 and restriction shall terminate at such time that the Property is no longer used as a Wendy's restaurant or if operation of a Wendy's restaurant ceases on the Property for a continuous period of three (3) months.
In 2004, AZT sold the adjacent property[2] (the servient estate) to R.C.C. Properties, L.L.C. R.C.C. subsequently received an offer to purchase this tract from Hannon's Food Service of Vicksburg, Inc., which intended to build a KFC (Kentucky Fried Chicken) franchise on the property. Hannon's agreed to purchase the property only if R.C.C. could obtain a satisfactory release of the servitude.
In February 2005, R.C.C. filed a petition for a declaratory judgment asking the district court either to invalidate the servitude or declare it inapplicable to the R.C.C. property. R.C.C. subsequently added Hannon's and Wendy's International, Inc., as defendants.
The court held a trial in July 2005 and heard testimony from several witnesses. Among the witnesses was Bobby Hannon, chairman of Hannon's, who explained that a KFC restaurant serves several types of chicken sandwiches and that any KFC built on the R.C.C. property would serve these sandwiches. Hannon also stated that "the deal would be off" as far as he was concerned if the servitude binding the property was found to be valid.
Edward Buchner, III, a certified public accountant from Vicksburg who handled Hannon's business, also testified. Buchner reviewed Hannon's sales figures for Hannon's KFC restaurants to determine what percentage of KFC restaurant sales[3] consisted of chicken sandwiches. For 2003, chicken sandwiches amounted to 1.77% of total sales; for 2004, the percentage was *1236 1.81%, and for the first six months of 2005, the percentages were January-1.91%; February-4.87%, March-14.18%, April-11.2%, May-10.8%, and June-6.7%.
Pete Subowicz, a field director for real estate for Wendy's International, testified that he negotiated this predial servitude with the original property owner when Wenstar acquired its Winnsboro property. He explained that deed restrictions limiting competition are a "pretty common standard" in the fast food industry. The servitude defined "primary business" as the sale of hamburgers, hamburger products or chicken sandwiches "if fifteen percent (15%) or more of its gross sales, exclusive of taxes, beverage and dairy product sales, consists of sales of hamburgers, hamburger products or chicken sandwiches (or any combination thereof)." In his view, a particular restaurant that wanted to locate on the servient estate would have to establish that its hamburger and chicken sandwich sales did not exceed 15%, as described above. In his view, that restaurant would have to establish that fact by submission of national sales records, then regional sales records and sales records of existing restaurants. Subowicz admitted that the existing predial servitude would not prohibit the construction of a KFC store provided the KFC owners could demonstrate that its sales of the proscribed sandwiches was less than 15%. Subowicz testified Wendy's International would never agree to the release of a predial servitude.
The court subsequently issued reasons for judgment stating its intent to invalidate the servitude in its entirety. The court stated, in part:
This Court understands that predial servitudes are to be strictly construed, and any doubts as to the extent or exercise of rights created by such servitudes should be resolved in favor of the servient estate. This Court believes that this predial servitude is unclear and ambiguous. It is not clear as to what time period the chicken sandwich sales are to be measured. Is it one week, one month, one quarter or one year? It is also unclear how the determination is to be made. Does the owner of the dominant estate have the right to examine the books and records on demand or must legal action be taken, or does the owner of the servient estate have a duty to provide those records on a weekly, monthly, quarterly, or annual basis? Since the servitude is silent as to both the time period and manner of showing compliance, this Court must determine the servitude to be ambiguous. Since servitudes are not favored and are to be strictly construed, any ambiguity is to be assessed against the dominant estate.
The court also noted that it did not consider the parol evidence presented by the parties regarding the intent when the servitude was negotiated and effected. On August 12, 2005, the court signed a judgment invalidating the servitude.

DISCUSSION
In Blanchard v. Rand, 34,442 (La. App.3/2/01), 781 So.2d 881, writs denied, 01-0897, 01-0931 (La.6/1/01), 793 So.2d 193, 194, this court explained that a predial servitude is a real right burdening an immovable. To have a predial servitude requires two different tracts belonging to different owners. A predial servitude is due to the estate rather than the owner of the estate and is a charge on the servient estate for the benefit of the dominant estate. La. C.C. art. 646.
La. C.C. art. 697 provides:
Predial servitudes may be established by an owner on his estate or acquired for its benefit.
The use and extent of such servitudes are regulated by the title by which they *1237 are created, and, in the absence of such regulation, by the following rules.
A predial servitude restricting or prohibiting commercial use of property is a negative, nonapparent servitude which may be acquired only by title. La. C.C. arts. 706, 707, 739; Mardis v. Brantley, 30,773 (La.App.2d Cir.8/25/98), 717 So.2d 702, 704, writ denied, 98-2488 (La.11/20/98), 729 So.2d 563. Once the document creating the servitude is recorded in the public records, the restriction is binding on subsequent owners who acquire the servient estate without further mention of the restriction in the act conveying the servient estate. Mardis, supra.
La. C.C. art. 730 provides:
Doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate.
La. C.C. art. 749 provides:
If the title is silent as to the extent and manner of use of the servitude, the intention of the parties is to be determined in the light of its purpose.
When a predial servitude is created by title, the intention of the parties to place a charge on one estate for the benefit of another estate, and the extent of the charge, must be expressed on the face of the title document and cannot be inferred or implied from vague or ambiguous language. Mardis, supra. Servitudes claimed under title are never sustained by implication; the title creating them must be express as to their nature and extent, as well as to the estate that owes them and the estate to which they are due. Williams v. Wiggins, 26,060 (La.App.2d Cir.8/17/94), 641 So.2d 1068.
We disagree with the trial court's finding that the servitude was invalid because the method of measuring "primary business" described by the servitude was ambiguous. The servitude in favor of Wenstar's property is a conventional predial servitude. The original vendor, AZT, and purchaser of the dominant estate, Wenstar, clearly intended to create a predial servitude restricting the use of the servient estate still owned by AZT.
The instrument transferring the property to Wenstar was entitled "Act of Cash Sale and Servitude." The intent of the proprietor to create a servitude must clearly appear on the fact of the document. Blanchard, supra. This instrument specifically stated a "predial servitude" was granted in favor of the property acquired by Wenstar. The "predial servitude" bound the adjacent property by prohibiting a certain use of the remaining property owned by AZT, the vendee. The title document clearly reflected the intention of the parties to create an obligation in favor of the dominant estate. Blanchard, supra. The extent of the charge on the servient estate is the prohibition against using the servient estate "for a restaurant with a drive-thru pick-up window, the primary business of which is the sale of hamburger products or chicken sandwiches (or any combination thereof)." The servitude is effective as written. The trial court erred as a matter of law in invalidating the servitude; therefore, we make a de novo review of the record.
Having found that the predial servitude is binding on the servient estate, we find that the trial court's concerns about the practical implementation of the servitude were perceptive. In particular, the method by which the "primary business" of the servient estate should be measured is unclear. The yearly totals of Hannon's KFC chicken sandwich sales for 2003 and 2004 were well underneath the 15% specification in the title, as was the average for 2005, but in three months of 2005, chicken sandwich sales approached 15% of Hannon's sales revenues.
*1238 Because the "primary business" measurement is related to the manner of use of the servitude, we look to the intent of the parties in creating the servitude. The trial court refused to consider parol evidence to determine that question. However, the intent of Wenstar and AZT in creating the servitude is apparent from the face of the title. Wenstar intended to prevent a competitor in the fast-food hamburger or chicken sandwich business from opening a restaurant next to the Wendy's. Toward that end, the servitude created by the parties defined the level of competition that would trigger the restriction.
Hannon's KFC sales figures, as recited at the hearing, showed that the revenues from chicken sandwiches sold at Hannon's other KFC restaurants never equaled or exceeded 15% of total restaurant sales. Although the future is uncertain, the only evidence presented showed that the "primary business" trigger in the servitude was never reached by the other Hannon's restaurants in the past. Interpreting the servitude in light of La. C.C. art. 730, the servitude does not prohibit the construction or operation of a KFC restaurant at this location.
We are not called upon to decide what result may obtain should the KFC, or any other restaurant, later have a revenue mixture that triggers the "primary business" measure in the servitude.[4] We note that doubt as to the manner of exercise of a predial servitude is resolved in favor of the servient estate. La. C.C. art. 730. The intention of the parties in light of its purpose is used to determine manner of use of the servitude. La. C.C. art. 749. Considering the contingent nature of Hannon's agreement to buy the property from R.C.C. and Hannon's testimony that a valid servitude would result in the deal being off, it is unlikely that a decision will be necessary on how to determine 15% of the proscribed sales figures.
As requested in R.C.C.'s pleadings, this decision is limited to the finding that a valid predial servitude exists in favor of the dominant estate (specifically described in footnote #1). The trial court judgment, which declares the predial servitude (quoted above) "invalid and of no effect as to the entirety of the Servient Estate" (specifically described in footnote #2), is reversed.

CONCLUSION
For the above reasons, the judgment of the trial court invalidating the servitude is reversed. Costs of this appeal are assessed to appellee.
REVERSED AND RENDERED.
NOTES
[1] Pursuant to La. C.C.P. art. 1919, we include the following description taken from the AZTWenstar transaction:

One certain portion of ground situated in Section 23, T14N-R7E, Franklin Parish, Louisiana, designated as portion of Tract 1 & being more fully described as follows: Commence at the intersection of the north right of way line of Allison Street and the old west right of way line of La. Hwy. No. 15 and measure N 08° 00' 50" W, along the old west right of way line of La. Hwy. No. 15 a distance of 930.00 feet to a point; thence measure S 81° 59' 10" W, a distance of 13.00 feet to the Point of Beginning; thence continue S 81° 59' 10" W, a distance of 250.00 feet to a point; thence measure N 08° 00' 50" W, a distance of 175.00 feet to a point; thence measure N 81° 59' 10" E, a distance of 250.00 feet to a point on the new west right of way line of La. Hwy. No. 15; thence measure S 08° 00' 50" E, along the new west right of way line of La. Hwy. No. 15, a distance of 175.00 feet to the Point of Beginning; which property has a municipal address of 3324 Front Street, Winnsboro, Louisiana, and which is hereinafter referred to as the Property.
[2] Pursuant to La. C.C.P. art. 1919, we include the following description taken from the AZTR.C.C. transaction:

A certain tract or parcel of land located in the West half (W1/2) of Section 23, Township 14 North, Range 7 East, Franklin Parish, Louisiana, being more particularly described as follows:
Commence at the Southeast Corner of Block 16 of the Ramage Place addition as shown on Plat No. 16B of the records of Franklin Parish, Louisiana; such corner being the intersection of the North boundary of Allison Street with the old West right-of-way line of Louisiana Highway No. 15, thence along said West right-of-way line N 08 degrees 00 minutes 50 seconds W a distance of 930.00 feet to a point and turn; Thence S 81 degrees 59 minutes 10 seconds W a distance of 13.00 feet to the POINT OF BEGINNING; Thence from the Point of Beginning S 81 degrees 39 minutes 10 seconds W a distance of 637 feet to a point and turn; Thence N 08 degrees 00 minutes 50 seconds W a distance of 480.00 feet to a point and turn; Thence N 81 degrees 59 minutes 10 seconds E a distance of 637.00 feet to a point and turn on the new west right-of-way line of La. Hwy. No. 15; Thence along said new west right-of-way S 08 degrees 00 minutes 50 seconds E a distance of 480.00 feet to the POINT OF BEGINNING, containing within said bounds 7.02 acres more or less.
LESS AND EXCEPT:
One certain portion of ground situated in Section 23, T14N-R7E, Franklin Parish, Louisiana, designated as portion of Tract 1 & being more fully described as follows: Commence at the intersection of the north right of way line of Allison Street and the old west right of way line of La. Hwy. No. 15 and measure N 08° 00' 50" W, along the old west right of way line of La. Hwy. No. 15 a distance of 930.00 feet to a point; thence measure S 81° 59' 10" W, a distance of 13.00 feet to the Point of Beginning; thence continue S 81° 59' 10" W, a distance of 250.00 feet to a point; thence measure N 08° 00' 50" W, a distance of 175.00 feet to a point; thence measure N 81° 59' 10" E, a distance of 250.00 feet to a point on the new west right of way line of La. Hwy. No. 15; thence measure S 08° 00' 50" E, along the new west right of way line of La. Hwy. No. 15, a distance of 175.00 feet to the Point of Beginning.
[3] Less taxes, beverages, and dairy.
[4] La. C.C. art. 2046 directs that the common intent of the parties is used to interpret a contract. Parol evidence is inadmissible to vary the terms of a written contract. However, if that contract could have more than one interpretation, there is ambiguity as to its provisions, or the intent of the parties cannot be ascertained by the language, then parol evidence is admissible to clarify the ambiguity and show intent of the parties. Fleet Fuel, Inc. v. Mynex, Inc., 40,683 (La.App.2d Cir.3/8/06), 924 So.2d 480. As noted previously, the parties' intent in creating the predial servitude is clear on the face of the instrument. Deciding whether or not the total restaurant sales of hamburgers, hamburger products or chicken sandwiches (or any combination thereof) meet or exceed 15% proscribed in the predial servitude must be determined by the intent of the parties if and when that issue be reached.